AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

FILED BY SP D.C.

FEB 26 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

United States of America )
v. )
) Case No. ~~20-8084-XXX~~
ANTONIO MARTINEZ ) 20-8094-DLB
)
)

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __May 2018 - February 18, 2020__ in the county of __Palm Beach__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. 841(a)(1) and 846 | Conspiracy to possess with intent to distribute 5 kilograms or more of cocaine |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Adam Ballew, S/A DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2-26-2020

_____
*Judge's signature*

City and state: West Palm Beach, FL         Dave Lee Brannon, US Magistrate Judge
                                            *Printed name and title*

## AFFIDAVIT FOR CRIMINAL COMPLAINT

Before me appeared Thomas Adam Ballew, who, being duly sworn, states as follows:

1. My name is Thomas Adam Ballew and I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since March 2008. I have received specialized training in the investigation of the distribution of controlled substances, including those that include the distribution of cocaine and other controlled substances. In the course of my work, I have interviewed numerous cooperating drug dealers and confidential sources, have observed and conducted undercover operations and reviewed recordings of undercover meetings. I have been both directly and indirectly involved with investigations during which the interception of wire communications occurring over telephones being utilized to facilitate the distribution of controlled substances have occurred. I have also made arrests and assisted with arrests for controlled substance offenses. I am thereby familiar with the methods used by drug dealers to sell controlled substances.

2. The information in this Affidavit is written for the limited purpose of obtaining a criminal complaint charging Antonio MARTINEZ with conspiracy to possess with intent to distribute five (5) kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Accordingly, it does not contain all I know about the case. The information herein is based on my own observations and participation in the investigation, discussions with other law enforcement officers including DEA agents, Palm Beach Sheriff's Office (PBSO) narcotics agents, and Broward Sheriff's Office (BSO) narcotics detectives, a confidential source, a cooperating defendant, a review of audio/video recordings made by devices that were activated during the purchases of cocaine conducted during this investigation, as well as a review of the transcripts of wire communications intercepted during the Court authorized wire intercept of telephone number (561) XXX-0811, which was utilized by Antonio MARTINEZ to facilitate the acquisition and

distribution of cocaine (hereinafter referred to as MARTINEZ's phone). Additionally, unless otherwise noted, the below-described conversations between MARTINEZ and the CS are based on preliminary transcriptions of consensually recorded conversations which were conducted in Spanish and are subject to further revisions. Similarly, the below described conversations between MARTINEZ and Juan Carlos CRUZ PAZ are based on preliminary transcriptions of intercepted wire communications which were conducted in Spanish and are also subject to further revision.

3. In early 2018, DEA and PBSO began investigating MARTINEZ, who was identified as a cocaine distributor operating in Palm Beach County, Southern District of Florida. During the course of this investigation, law enforcement developed a confidential source (CS)[1] who identified MARTINEZ as a cocaine source of supply. More specifically, the CS estimated that the CS had known MARTINEZ for approximately three (3) years and initially purchased approximately one (1) gram of cocaine from MARTINEZ upon first meeting him. The CS subsequently increased the quantity of cocaine the CS purchased from MARTINEZ and eventually began purchasing approximately four (4) ounces of cocaine from MARTINEZ every two weeks. The CS further estimated that the CS had purchased approximately four (4) ounces of cocaine from MARTINEZ every two weeks for approximately eighteen (18) months (with the last uncontrolled purchase of cocaine occurring on or about May 6, 2018). During this time, the CS stated that the CS conducted cocaine transactions with MARTINEZ at MARTINEZ's place of employment

---

[1] The CS is not being paid for assistance. Instead, the CS is assisting law enforcement with the ongoing investigation in the hope of receiving some amount of judicial consideration with respect to the CS's pending cocaine trafficking charges. The CS has an extensive criminal history dating back to the 1970s that includes arrests for various offenses, including: possession of stolen mail/credit cards, conspiracy to steal money, aggravated assault, multiple counts of forgery, attempt to commit fraud, multiple counts of possession of stolen property, possession of counterfeit driver's license, passing a forged document, multiple counts of larceny and grand larceny, grand theft, probation violation, domestic violence battery, driving under the influence, harassment, possession of a controlled substance, and possession of a weapon. To date, the information provided by the CS to law enforcement officials has proven to be truthful and reliable. Further, to the extent possible, the information provided by the CS has been independently corroborated by recorded and/or monitored conversations and telephone records.

(Tony's Body Shop), MARTINEZ's residence (identified as XXXX Palm Road, West Palm Beach, Florida, and hereinafter referred to as MARTINEZ's residence), and in other locations in Palm Beach County, Florida, such as various parking lots.

4.      Between May 2008 and August 2009, investigators utilized the CS to conduct six (6) separate controlled purchases of cocaine from MARTINEZ.[2]

5.      On September 11, 2019, the Honorable Donald M. Middlebrooks, United States District Court, Southern District of Florida, authorized the interception of wire communications occurring over MARTINEZ's phone. Investigators began intercepting the wire communications occurring over MARTINEZ's phone on September 12, 2019, and the interceptions terminated on October 11, 2019. During this period, several phone calls were intercepted with one of MARTINEZ's co-conspirators, Juan Carlos CRUZ PAZ. The following are examples of these intercepted communications:

6.      On September 28, 2019, at approximately 8:48 a.m., MARTINEZ received an incoming call from CRUZ PAZ's phone and he spoke with CRUZ PAZ. After exchanging greetings, MARTINEZ stated, "Talk to me chief. What's up? Today is a go." CRUZ PAZ responded, "Bad, bad news brother, check this out. The old woman took everything brother." MARTINEZ asked, "Who?" CRUZ PAZ responded, "I left last night with [unintelligible], that crazy bitch took my box. I had two, two, two heavy equipments in there. She took it. I had like seven little ones and I had some money in there. She took it all. Lucky for me I took one. I took three up there and I returned with one and now I'm calling her, brother. She took everything here, everything. Furniture and the whole world and she finished me, brother. She took sixty something

---

[2] Each of the transactions involved the controlled purchase of approximately four (4) ounces of cocaine from MARTINEZ for a grand total of approximately twenty-four (24) ounces of cocaine. All of the cocaine was submitted to the PBSO Laboratory for chemical analysis, which confirmed that the substances purchased from MARTINEZ contained a detectable amount of cocaine.

thousand dollars from me, brother. What the fuck? That old woman finished me, brother, now I'm fucked. I'm fucked." MARTINEZ asked, "Where did she go? Where she go?" CRUZ PAZ responded, "I don't know! I'm calling and she doesn't want to say where she is. [Unintelligible] I have an equipment here, I have an equipment here that I brought it from there last night. What the fuck dude, no." MARTINEZ stated, "Well, if you want, bring it here to me. I'm here." CRUZ PAZ began talking about how the "woman" finished him and he was going crazy, and he stated, "Look, come pick it up. I'm scared of she coming over here. I don't think she will show up here, brother, because, because she, she finished me. She took two animals, brother, two animals plus, plus, plus seven or eight small bags. [Unintelligible] plus some money I had here. Now I'm on the streets. On the street! What the fuck, bro? People had all the reason when they would tell me 'Hey, she's going to fuck you, she's going to fuck you.' I got here at two in the morning [unintelligible] and I got here, everything brother she took the furniture and the whole world. And when I went to the box, shs! She left, she left me a letter in there." MARTINEZ asked CRUZ PAZ to hold on. Agents heard another phone ringing in the background and heard MARTINEZ answer that phone. MARTINEZ then returned to the conversation and asked, "Then, she took the furniture too?" CRUZ PAZ advised, "Yeah, no, the furniture were hers. I don't care. But you can believe she took two heavy equipments, two big chargers, plus the other stuff I had there. Plus a, no, no, no, no, now I'm fucked. Fucked! What kind of shit is that, my brother! Hey and last night when I left, I left around at one or so in the afternoon and damn! I had the urge to take everything out from there man. But look at that man, how the woman figured me out, brother." MARTINEZ again asked CRUZ PAZ to hold on and appeared to answer another phone that was heard ringing in the background. CRUZ PAZ stated, "Hey, look," and MARTINEZ responded, "Talk to me." CRUZ PAZ advised, "Come and pick this up. And I'll pick that up later because

I'm scared to leave here." MARTINEZ replied, ". . . listen to what I'm going to tell you," and CRUZ PAZ stated, "Tell me." MARTINEZ advised, "Listen to me, I [stutters] the one who is scared is me. I'm going to tell you why, because you don't know what else that fucking crazy lady can do." MARTINEZ began to explain to CRUZ PAZ that the "woman" was capable of doing anything and CRUZ PAZ reiterated that she had finished CRUZ PAZ. MARTINEZ then stated, "No, but the problem, look, listen, the problem is not that she finished you. You have to use your, you have to use your head now." CRUZ PAZ responded, "No, no, now I'm crazy." MARTINEZ advised, "That's why I'm going to tell you because she could send you to die with those people. Remember." CRUZ PAZ asked, "Huh?" MARTINEZ stated, "She can kill you again with those people to avoid giving back your stuff." CRUZ PAZ responded, "No, no. I don't think so. She won't give back shit. I have been calling to everyone. I have talked twice to her [unintelligible]. I don't know where she is at . . . ." CRUZ PAZ again lamented about how CRUZ PAZ was in trouble. MARTINEZ stated, "I'm going to tell you something. The best thing you can do is call your associate that has your same name and have him come and pick up what's left behind, just in case. Because she's, she is capable of calling those people, and it goes . . . ." CRUZ PAZ and MARTINEZ's voices overlapped and CRUZ PAZ stated, "Yeah, I have here, I have here [unintelligible] big boxes. Do you want me to bring them to you?" MARTINEZ responded, "Well, if you want, bring them. Yeah." CRUZ PAZ stated, "I'm going to leave them with you but, alright I'll bring them there." MARTINEZ responded, "I'm not going there, what I don't want to do is go there [laughs] in those conditions. Are you crazy?" CRUZ PAZ then advised, "No, no, no I'll bring it to you. I'll bring it to you. Bye." MARTINEZ said "Bye," and the call ended.

   7. At approximately 9:26 a.m., law enforcement established visual surveillance at XXX Bradley Court, West Palm Beach, Florida (a residence frequented by CRUZ PAZ and

hereinafter referred to as the Bradley Court address). Approximately 15 minutes later, law enforcement was able to establish simultaneous visual surveillance at MARTINEZ's residence.

8.  At approximately 9:45 a.m., a law enforcement officer conducting surveillance at MARTINEZ's residence observed a red Jeep Wrangler with a black hard top back out of MARTINEZ's residence's driveway and noted that it was being driven by a Hispanic male wearing a white T-shirt. Due to uncertainty regarding CRUZ PAZ's pending delivery of a kilogram of cocaine, law enforcement maintained their surveillance positions and did not follow the Jeep as it departed from the area.

9.  At approximately 10:50 a.m., law enforcement conducting surveillance at the Bradley Court address observed the aforementioned Jeep arrive at the residence and noted that the Hispanic male wearing the white T-shirt exited the driver's seat carrying a bag. At this point, the Hispanic male was positively identified as CRUZ PAZ and it was determined that the Jeep had Florida license plate Y37QQX (hereinafter referred to as the Jeep).[3] CRUZ PAZ was observed entering the residence where he stayed for a short time before returning to and re-entering the Jeep and departing the residence. Law enforcement initiated mobile surveillance of CRUZ PAZ and followed him to the Park Place complex on Elmhurst Road in West Palm Beach, Florida. Law enforcement entered the complex a short time after CRUZ PAZ and located the Jeep parked, unoccupied, in the lot. Law enforcement then established surveillance in the lot.

14. At approximately 11:40 a.m., law enforcement observed CRUZ PAZ exit XXXX Elmhurst Road, Unit D (hereinafter referred to as the Elmhurst Road address), and stand outside briefly as if he was waiting for someone. CRUZ PAZ then re-entered the apartment and, a

---

[3] The law enforcement officer who observed the Jeep arrive identified CRUZ PAZ from his DAVID system photograph. Additionally, a check of the DAVID system revealed that license plate Y37QQX is registered to a red 1993 Jeep that is registered to CRUZ PAZ with a listed address of XXX Bradley Court, West Palm Beach, Florida.

short time later, a gray Chrysler 300 with dark tinted windows and Florida license plate Y04WAP arrived in the lot and parked. Law enforcement observed a Hispanic male wearing a red shirt and a light colored hat (later identified as an unindicted co-conspirator (UCC) and hereinafter referred to as UCC1) exit the Chrysler 300 and walk to and enter Unit D. A short time later, law enforcement observed CRUZ PAZ and UCC1 exit the apartment, enter the Chrysler 300, and exit the parking lot. Surveillance units followed the Chrysler 300 as it drove to the Enterprise Rent-A-Car located at 7750 Okeechobee Boulevard, West Palm Beach, Florida. Ultimately, CRUZ PAZ and UCC1 entered a black Ford Explorer bearing Florida license plate JALA30 and departed from Enterprise. Law enforcement initiated mobile surveillance of the Explorer and followed CRUZ PAZ and UCC1 as UCC1 drove the Explorer to the Latin American Grill, 15342 NW 79th Court, Hialeah, Florida, where they arrived at approximately 1:15 p.m. Law enforcement observed CRUZ PAZ and UCC1 exit the Explorer and walk towards the restaurant. A short time later, CRUZ PAZ walked back to the Explorer by himself and quickly exited the parking lot. At this point, law enforcement was unable to conduct mobile surveillance of CRUZ PAZ and surveillance was terminated.

10.  On September 28, 2019, at approximately 9:48 p.m., MARTINEZ received an incoming call from CRUZ PAZ's number and spoke with CRUZ PAZ. After exchanging greetings, CRUZ PAZ stated, "Hey I went, I went down there to Miami, and I solved it." MARTINEZ asked, "What?" CRUZ PAZ stated, "Uh, I went to Miami and I solved it, I solved it." CRUZ PAZ added, "You know, I went to talk to the neighbors. A U-Haul truck came and picked up all the things. I believe she is at her son's house in Port Saint Lucie . . . I talked to her daughters and they told me they will talk to her and I told them 'Tell her that she can keep all the other things but that stuff, but that [stutters] she must return it to me' . . . ." CRUZ PAZ began

complaining about the situation and MARTINEZ interrupted and stated, "I'll, I'll call you back, dude [stutters] I'll call you back. CRUZ PAZ agreed and the call ended.

11.     At approximately 9:53 p.m., MARTINEZ placed an outgoing call to CRUZ PAZ's number and spoke with CRUZ PAZ. CRUZ PAZ told MARTINEZ, "These people down there are really pissed off. I went down there and I solved but, shit. These people want to brush her up. Do you get me?" MARTINEZ acknowledged and CRUZ PAZ stated, "Then, she left me a letter over there, a nasty letter . . . I wish you could see all what she tells me on that letter, like in case I do something. Do you get me?" CRUZ PAZ complained about the situation and MARTINEZ asked, "And she does not answer the phone nor anything, right?" CRUZ PAZ advised, "No, she turned it off . . . I spoke with her like two or three times . . ." and indicated that CRUZ PAZ told her, "Please, give me back the [unintelligible]. You can keep the other thing but that, give me back that, please. Please, otherwise there will be an awful problem . . . ." CRUZ PAZ continued to speak about the situation and later added ". . . And she even left me a letter inside the box, dude. When I opened the box, she even had the box key . . . ." CRUZ PAZ informed MARTINEZ, "Shit, brother! No, no, no, fuck! [Stutters] I have to pay these people and that's it! There is no other way! She really fucked me up, man! She waited for the right opportunity!" MARTINEZ advised, "She has, she has been watching you." CRUZ PAZ responded, "Oh, no. She really fucked me up and, with a good amount! Not a piece of shit, you know." MARTINEZ agreed and CRUZ PAZ stated, "If it were a small amount, I would care a shit. But no, she got me! She got me with two big bricks. Plus the money that she took and, some other crap that she also took away." CRUZ PAZ later stated, "They have that stuff over there. They have not gotten rid of that. Whom would they give it to? Those people deal just with little stuff. I don't know. Unless she call somebody and give it to him. You know? But this won't end up just here . . . And these people from down

there want to, come up here. I told them 'No, no' because, do you get me? All the shit would fall over me, brother." MARTINEZ agreed and CRUZ PAZ advised, "I already called her several times from the other phone of mine, uh, you know, and...." MARTINEZ interrupted and asked, "And, listen, and, and what does she say on the letter?" CRUZ PAZ stated, "What? The letter? I have it saved . . . she says that she knows everything what I do for a living, all what I deal with, uh, everything, everything . . . ." CRUZ PAZ later added, ". . . But I blame myself, brother. I blame myself for having left that stuff over there, knowing all the things she already did to me in the past. Knowing that she already stole money from me, that she stole the other, I don't know dude, how I, I'm too naïve. Too naïve. I'm a damn stupid . . . . Shit!" CRUZ PAZ also repeated what CRUZ PAZ said to the girlfriend's daughters, "I told them: 'Listen, tell her that I forgive her, and that, to give back that stuff and they could keep the other, that I don't care about it. But not the other stuff.' Do you get me? Because the other stuff is [scoffs] sixty grands that I have to give back, brother. Did you hear?" MARTINEZ stated, "Dammit," and CRUZ PAZ reiterated, "For you to know. Sixty grands." After some additional conversation, MARTINEZ and CRUZ PAZ agreed to talk later and the call ended.

12. On February 11, 2020, United States Magistrate Bruce E. Reinhart, Southern District of Florida, authorized a tracking warrant for a black 2007 Dodge Ram bearing Florida license plate 448REK, also known to be utilized by CRUZ PAZ and registered to CRUZ PAZ and R.C. with a registered address of XXX Bradley Court, West Palm Beach, Florida 33405 (hereinafter referred to as the Dodge Ram).

13. On February 13, 2020, at approximately 3:10 a.m., law enforcement installed a covert tracking device on the Dodge Ram as it was parked in the parking lot in the vicinity of the Elmhurst Road address. At this time, electronic tracking of the Dodge Ram was initiated.

14.  On February 14, 2020, at approximately 8:20 a.m., the tracking device reported its location to be 3696 S. Congress Avenue, Palm Springs, Florida. A short time later, law enforcement located the Dodge Ram parked in a lot of a medical center located at 3460 S. Congress Avenue, Palm Springs, Florida, and later observed CRUZ PAZ walking between the Dodge Ram and the business. At approximately 10:00 a.m., law enforcement established mobile surveillance of CRUZ PAZ as CRUZ PAZ departed in the Dodge Ram.

15.  At approximately 11:20 a.m., law enforcement observed CRUZ PAZ park the Dodge Ram in a common area between 8336 and 8360 Dundee Terrace, Miami Lakes, Florida. Law enforcement observed that CRUZ PAZ exited from the vehicle empty handed and walk toward 8356 Dundee Terrace, Miami Lakes. Approximately 32 minutes later, law enforcement observed CRUZ PAZ and an Hispanic male wearing a white button down shirt (later identified by law enforcement and CRUZ PAZ as Yaciel MARAGOTO) emerge from 8356 Dundee Terrace, Miami Lakes (hereinafter referred to as MARAGOTO's residence) and stand at the rear of a brown Nissan Titan that was backed in near the door to the residence. After a short time, CRUZ PAZ and MARAGOTO re-entered MARAGOTO's residence and CRUZ PAZ then exited and was observed to be carrying a white, envelope shaped package under one arm and a bag in CRUZ PAZ's hands. CRUZ PAZ then entered the Dodge Ram and was followed by law enforcement as CRUZ PAZ drove away. Law enforcement maintained constant visual surveillance of CRUZ PAZ as CRUZ PAZ ultimately drove north on Interstate 95 and entered Palm Beach County, Florida.

16.  At approximately 12:55 p.m., a marked Palm Beach Sheriff's Office vehicle initiated a traffic stop of the Dodge Ram after observing CRUZ PAZ change lanes on Interstate 95 without signaling. After making contact with CRUZ PAZ, CRUZ PAZ provided consent to search the Dodge Ram. Upon doing so, law enforcement located a white envelope that contained two

clear plastic bags that each contained a chunky white substance suspected to be cocaine.[4] At this point, CRUZ PAZ was detained and was relocated to a nearby area off of Interstate 95 where CRUZ PAZ was advised of the *Miranda* warnings. Post-*Miranda*, CRUZ PAZ initially stated that CRUZ PAZ had no knowledge of cocaine being inside the Dodge Ram. Law enforcement informed CRUZ PAZ that, given CRUZ PAZ's criminal history involving controlled substances, CRUZ PAZ's story was not believable. CRUZ PAZ was then advised that if CRUZ PAZ wanted to cooperate with the investigation in an effort to help CRUZ PAZ and possibly receive future judicial consideration, law enforcement could spend additional time speaking with CRUZ PAZ. CRUZ PAZ agreed and was then transported to the Palm Beach County Sheriff's Office for an interview.

17. During the subsequent interview, CRUZ PAZ identified MARTINEZ, to whom CRUZ PAZ referred to as "Tony," as his primary cocaine customer. CRUZ PAZ stated he had been selling kilogram amounts of cocaine to MARTINEZ for the past year to year-and-a-half and estimated that he supplied MARTINEZ with one to two kilograms of cocaine every two (2) to three (3) weeks during that time period. CRUZ PAZ reported that he (CRUZ PAZ) brings the cocaine to MARTINEZ's residence and MARTINEZ pays him $30,250.00 United States Currency (USC) for each kilogram of cocaine. CRUZ PAZ further stated that he last supplied MARTINEZ with a kilogram of cocaine approximately two (2) to three (3) weeks prior.

18. On February 21, 2020, law enforcement conducted another interview with CRUZ PAZ. During this interview, law enforcement asked CRUZ PAZ about the two kilograms of

---

[4] Law enforcement later conducted a field test of the chunky white substance, which produced positive results for the presence of cocaine. Law enforcement also determine that the total package weight of the suspected cocaine (including the evidence bag) was approximately 72 grams. The suspected cocaine was later submitted to the PBSO Laboratory for a chemical analysis, the results of which are currently pending.

cocaine that were previously stolen from him. CRUZ PAZ advised that, prior to the cocaine theft, he had acquired five (5) kilograms of cocaine on consignment from MARAGOTO. CRUZ PAZ stated that he (CRUZ PAZ) had secured two (2) of the five kilograms in a locked cabinet at the Elmhurst Road residence and he and another unindicted co-conspirator (hereinafter referred to as UCC2) had transported the remaining three (3) kilograms of cocaine to the Middle District of Florida for distribution. CRUZ PAZ stated that he and UCC2 only sold two (2) of the three (3) kilograms and he (CRUZ PAZ) subsequently brought the remaining kilogram of cocaine back to the Southern District of Florida. CRUZ PAZ advised that the following morning he opened the locked cabinet and found that the two (2) kilograms of cocaine were missing and a letter from his ex-girlfriend was now inside. CRUZ PAZ stated that he contacted his ex-girlfriend and requested that she return the cocaine to him because he owed his source of supply for the cocaine and did not want any problems. CRUZ PAZ stated that he also contacted MARTINEZ about the situation and ultimately transported the remaining kilogram of cocaine (which CRUZ PAZ had brought back from the Middle District of Florida) to MARTINEZ's residence and sold it to MARTINEZ for $30,250.00 USC. CRUZ PAZ stated that MARTINEZ always utilized a scale located inside MARTINEZ's residence to weigh the cocaine and always checked the quality of the cocaine by removing a portion of the cocaine from the kilogram and placing it on a spoon and adding water to observe how quickly and thoroughly it dissolved. CRUZ PAZ further advised that MARTINEZ would typically pay the entire amount for the cocaine and would walk outside the back door of the residence to a patio area and return a short time later with plastic bags containing USC from which MARTINEZ would remove the amount of money for the cocaine. CRUZ PAZ reported that he (CRUZ PAZ) was not aware of exactly where MARTINEZ kept the bags of money. CRUZ PAZ

estimated that the last time he sold MARTINEZ cocaine was in early February 2020 and reported that the transaction was for a kilogram of cocaine and it occurred at MARTINEZ's residence.

18. Based on the forgoing information, I believe there is probable cause to believe that Antonio MARTINEZ committed the offense of conspiracy to possess with intent to distribute more than 5 kilograms of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Thomas Adam Ballew, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me in West Palm Beach, Florida this 26^{R} day of February 2020.

Dave Lee Brannon
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

CASE NO.   20-8094-DLB

Defendant's Name:   ANTONIO MARTINEZ

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|---|---|---|---|
| 1 | Conspiracy to possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine | 21:841(a)(1) and 846 | Minimum 10 years – life imprisonment<br>SR: 5 years-life<br>$10 million fine<br>$100 special assessment |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-8084-DLB

FILED BY _____ D.C.
FEB 26 2020
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

UNITED STATES OF AMERICA

v.

ANTONIO MARTINEZ,

        Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?   ___ Yes ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   ___ Yes ✓ No

        Respectfully submitted,

        ARIANA FAJARDO ORSHAN
        UNITED STATES ATTORNEY

BY: /s/ Rinku Tribuiani
        RINKU TRIBUIANI
        ASSISTANT UNITED STATES ATTORNEY
        Florida Bar No.   0150990
        500 South Australian Avenue, Suite 400
        West Palm Beach, Florida 33401
        Tel:    (561) 820-8711
        Fax:   (561) 820-8777
        Email: Rinku.Tribuiani@usdoj.gov